**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SERGEI KOVALEV** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **No. 16-6380** |
| | : | |
| **CITY OF PHILADELPHIA., _et al._** | : | |

**KEARNEY, J.**                                                    **February 28, 2017**

<u>**MEMORANDUM**</u>

Citizens may appear in the City's public building to advocate before administrative bodies subject to rules based on ensuring orderly resolution of the City's business.    The police and administrative officers must balance their police authority to manage the administrative process against the citizens' rights to properly question public officials.   In reviewing a citizen's _pro se_ complaint raising a variety of constitutional and state law claims challenging his removal from a public building, characterizing him as disorderly and allegedly chilling his right to advocate or challenge the City's decisions, we dismiss many of his claims but find certain limited claims may proceed into discovery.   We grant the Defendants' motion to dismiss in part in the accompanying Order.

**I.       Facts alleged in the _pro se_ Complaint**

Sergei Kovalev, advocating for an unnamed religious entity used as a church, claims the City of Philadelphia assessed commercial trash collection fees against his church even though he believes it is exempted from such fees.[1]   On October 14, 2015, Sergei Kovalev contested these fees in an informal hearing conducted by the City of Philadelphia's Office of Administrative Review, located in a public building.[2]

At some point after the hearing, Mr. Kovalev sent Paula Weiss—the Executive Director for the Philadelphia Office of Administrative Review and Tax Review Board—a complaint about the hearing master's attempt to "abuse" and "intimidate" Mr. Kovalev with "false claims" about his status as "judge" and references to the hearing room as a "court."[3]

Approximately two months later, on December 10, 2015, Mr. Kovalev returned for another Tax Review Board hearing conducted by the Philadelphia Office of Administrative Review, located "on public property accessible by any member of the public during business hours."[4]   The Board refused to make a decision at the hearing about the trash collection fees even though such decisions are "supposed to be made on the day of hearing or approximately within a month."[5]   Mr. Kovalev told the Board during the hearing he wanted to appeal to the Court of Common Pleas.[6]

After the Board hearing, Mr. Kovalev walked into the public area in front of the reception desks of the Office of Administrative Review and asked for a list of the Board members.[7]   When he received the list, he noticed some board members did not attend his hearing.[8]   A "representative" of the Office of Administrative Review suggested Mr. Kovalev go into the hearing room and check the Board members' name signs placed on the table.[9]

As Mr. Kovalev went into the hearing room, the Board members began leaving the hearing room.[10]   Mr. Kovalev did not disturb anyone in the room.[11]   He remained in the room for less than a minute, just enough time to compare the Board members' name signs with his list.[12]

Upon returning to the public area in front of the reception desks, Mr. Kovalev observed three fully armed deputy sheriffs entering the public area of the Office of Administrative Review.[13]   The deputy sheriffs communicated quietly with the representative of the Office of

Administrative Review and turned their heads in Mr. Kovalev's direction.[14]   Mr. Kovalev later identified these deputy sheriffs as Sergeant Angelinel Brown, Cody Sheriff, and Andrea Sharamatew.[15]

Although Mr. Kovalev had additional questions about the hearing, he decided to walk out of the public reception area because he felt very uncomfortable about the armed deputy sheriffs, who were now staring at him.[16]   While leaving, Mr. Kovalev noticed the deputy sheriffs following him.   Mr. Kovalev asked the deputy sheriffs, "Why are you following me? Something is wrong?"[17]   Sergeant Brown stepped very close to Mr. Kovalev and said, in a very intimidating pose, "Someone does not want you to be here . . . . Move on."[18]

Mr. Kovalev asked, "What is going on?"[19]   Sergeant Brown started walking toward Mr. Kovalev, making him step back to avoid physical contact, and continued ordering Mr. Kovalev to move on.[20]   Sergeant Brown continued doing this until Mr. Kovalev reached the elevator when she told him, "Get into the elevator and leave."[21]

Mr. Kovalev exited the building.[22]   He then walked to another entrance leading to the City of Philadelphia Sheriff's Office, located in the same building.[23]   Mr. Kovalev wanted to determine what happened and why the deputy sheriffs "harassed and chased [him] from the public office where he was peacefully present and was conducting necessary and lawful affairs during business hours."[24] As Mr. Kovalev approached the Sheriff's Office, he saw Sergeant Brown standing in front of the entrance.[25]   Sergeant Brown again walked toward Mr. Kovalev, giving Mr. Kovalev "no other choice" but to step back to avoid contacting Sergeant Brown.[26]

Mr. Kovalev stated, "I want to clarify what is going on."[27]   Sergeant Brown answered, "There is nothing to clarify, nothing happened."[28]   Sergeant Brown continued walking toward Mr. Kovalev until they were in the middle of the hall in front of the entrance to the Sheriff's

3

Office.[29]   Mr. Kovalev told Sergeant Brown "he wants to know why she forced him to leave and why she is interfering with his right to enter the Sheriff's Department."[30]   Sergeant Brown again responded "nothing happened and there is nothing for [Mr. Kovalev] to do in the Sheriff's Department."[31]

A short time later, Deputy Sheriff C. Sheriff and Deputy Sheriff Sharamatew walked out of the Sheriff's Office and informed Sergeant Brown they received a telephone call from the Philadelphia Office of Administrative Review.[32]   Deputy Sheriff Sharamatew returned to the office, and about eight to ten minutes later he returned with an Incident Report.[33]   The Incident Report specified Yolanda Kennedy, a Clerical Supervisor in the Office of Administrative Review, called Mr. Kovalev a "disorderly person."[34]   Mr. Kovalev claims he did not behave disorderly. For almost twenty minutes, Sergeant Brown blocked Mr. Kovalev from entering the Sheriff's Office by stepping in front of him each time he attempted to enter.[35]

Mr. Kovalev alleges because Ms. Kennedy is the supervising clerk of the Office of Administrative Review, "it is reasonably assumed that [she] contacted and got approval from [Director] Weiss to initiate [a] false report to falsely label [Mr. Kovalev] as 'disorderly person' only because [Mr. Kovalev] very politely asked for the list of Board members; and obviously, [Ms.] Kennedy and [Director] Weiss did not like it."[36]

Seven months after the hearing on Mr. Kovalev's appeal, the Board issued its decision denying his appeal.[37]   Mr. Kovalev alleges Director Weiss and Ms. Kennedy had control of the appeal process and discouraged Board members from making any decisions in Mr. Kovalev's case for seven months in retaliation for sending a complaint to Director Weiss.[38]

4

## II.       Analysis

Mr. Kovalev *pro se* sued the City of Philadelphia, Director Weiss, Ms. Kennedy, and Sergeant Brown for a variety of claims arising under the United States Constitution and state law: the City and Director Weiss (in her individual capacity) failed to train and supervise subordinate employees, causing a violation of Mr. Kovalev's constitutional rights; Director Weiss, Ms. Kennedy, and Sergeant Brown violated the First, Ninth, and Fourteenth Amendments by preventing him from accessing areas generally accessible to the public; Director Weiss and Ms. Kennedy violated the First and Fourteenth Amendments by retaliating against Mr. Kovalev for engaging in protected speech; Ms. Kennedy and Sergeant Brown violated the Ninth and Fourteenth Amendments by discriminating against Mr. Kovalev on the basis of his race, national origin, and ethnicity; Director Weiss, Ms. Kennedy, and Sergeant Brown intentionally and negligently inflicted emotional distress; Ms. Kennedy defamed Mr. Kovalev by characterizing him as disorderly; Sergeant Brown assaulted Mr. Kovalev; and Sergeant Brown harassed Mr. Kovalev.

Defendants moved to dismiss the Complaint.[39]   We grant Defendants' Motion as to his claims for Ninth Amendment violations, substantive due process violation against Sergeant Brown, procedural due process violations,[40] Fourteenth Amendment race/ethnicity/national origin discrimination, intentional infliction of emotional distress against Sergeant Brown, negligent infliction of emotional distress, defamation, and harassment.   We also grant Defendants' Motion as to Mr. Kovalev's First Amendment retaliation claim to the extent it is based on Ms. Kennedy and Director Weiss requesting the sheriffs forcibly remove Mr. Kovalev from the area and discouraging the Board from making a decision.   We deny Defendants' Motion in all other respects.

**A.   We dismiss Mr. Kovalev's Ninth Amendment claims.**

We dismiss Mr. Kovalev's claims to the extent he asserts them under the Ninth Amendment because "[t]he Ninth Amendment does not independently provide a source of individual constitutional rights."[41]

**B.  Mr. Kovalev states a First Amendment right of access and right to information claim.**

Defendants argue Mr. Kovalev fails to state a claim for First Amendment retaliation.  We do not view his claim in Count II as stating a First Amendment retaliation claim.  Mr. Kovalev alleges he "had a constitutional right to express his opinion or request in [an] appropriate manner public information," as well as the "right to enter public offices during business hours, to remain for lawful purposes on public property during business hours and, [] to ask City employees question [sic] about involved administrative procedures." [42]   We construe his misnamed retaliation claim in Count II as alleging a violation of Mr. Kovalev's First Amendment right of access to public property for lawful purposes and the right to public access to information.

The First and Fourteenth Amendments together prohibit "governments from 'abridging the freedom of speech, or of the press . . . .' "[43]  This right "encompasses the positive right of public access to information and ideas," which includes the right to "some level of access" to public buildings where information is disseminated, including public libraries.[44]

The right to freedom of speech includes a right of public access in a variety of proceedings including trials, *voir dire* of jurors in criminal cases, post-trial juror examinations, and public meetings of city planning commission.[45]   According to a Court of Appeals, "Supreme Court decisions amply support the proposition that there is a general right to go to or remain on public property for lawful purposes . . . ."[46]   For example, in *Shuttlesworth v. City of Birmingham*, the

Supreme Court held unconstitutional an ordinance making it unlawful to stand or loiter on the sidewalk after having been requested by a police officer to move on, stating the ordinance—"with its ever-present potential for arbitrarily suppressing First Amendment liberties"—is the kind of law which "bears the hallmark of a police state."[47]

More recently, a plurality of the Supreme Court in *City of Chicago v. Morales* held "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment."[48] The Court found it "apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers . . . or the right to move 'to whatsoever place one's own inclination may direct' identified in Blackstone's Commentaries."[49] At least three Courts of Appeals have followed *Morales* and found a liberty interest to remain in a place open to the public.[50]

The First Amendment, however, "requires neither equal nor unlimited access to public places."[51]  "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue."[52]  The Supreme Court has identified three classes of government fora, each demanding a unique First Amendment analysis.

The first class—public fora—includes "places which by long tradition or by government fiat have been devoted to assembly and debate" including "streets and parks and public sidewalks." [53]  "The government's right to limit First Amendment activity in these 'quintessential' public fora is 'sharply circumscribed.'"[54]

The second class—designated or limited public fora—"consists of 'public property which the state has opened for use by the public as a place for expressive activity.'"[55]  Once the government opens up this forum, it "is bound by the same limitations as exist in the traditional

public forum context."[56]   Such fora include public libraries,[57] public university meeting places,[58] school board meetings,[59] municipal theaters,[60] and similar fora used by the public in a way intended by the government.[61]

The third class consists of "'nonpublic' fora which are not 'by tradition or designation fora for public communication . . . .'"[62]   "In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."[63]   "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."[64]

The forum Mr. Kovalev encountered is not a public forum akin to a street, sidewalk, or public park, but falls within either the second or third classes of fora.   In determining the type of forum Mr. Kovalev encountered, we observe: (1) the government's intent to open a non-traditional forum for expressive activity; (2) the extent to which the forum is used by the public; and (3) the nature of the forum along with its compatibility with expressive activity.[65]

Mr. Kovalev claims he was lawfully present in the building where the Office of Administrative Review and Sheriff's Office is located, during which he sought public information during business hours.   He also alleges the encounter occurred "on public property accessible by any member of the public during business hours."[66]   We lack facts allowing us to engage in a fulsome analysis of the nature of the forum he encountered, whether the City intended it for public use, and the extent to which the public used it.   Even so, it seems apparent Mr. Kovalev could remain in an area accessible to the general public and request public information so long as he does so without breaking the law, which he alleges he did not do.   Sergeant Brown allegedly prevented him from remaining in the Administrative Office area and from entering the

Sheriff's Office at the direction of Ms. Kennedy and Director Weiss.

Mr. Kovalev adequately states a claim in Count II for a violation of his First Amendment right of access and right to public access to information.

### C. Mr. Kovalev pleads a First Amendment retaliation claim against Director Weiss and Ms. Kennedy.

Defendants argue Mr. Kovalev fails to state a claim for First Amendment retaliation in Count III.   To establish a retaliation claim under § 1983, Mr. Kovalev must plead: (1) he engaged in protected activity; (2) Defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights; and (3) a causal connection between the protected activity and the retaliatory action.[67]   Defendants dispute the second element, arguing Sergeant Brown's asking Mr. Kovalev to leave the building and her stopping Mr. Kovalev from entering the office would not deter a reasonable person from continuing to exercise her right to free speech.

Defendants mischaracterize Mr. Kovalev's First Amendment retaliation claim.   Mr. Kovalev alleges three forms of retaliatory activity:   (1) Director Weiss and Ms. Kennedy filing of the false report, which both Ms. Kennedy and Director Weiss played a role in doing; (2) Director Weiss and Ms. Kennedy requesting the sheriffs to forcibly remove him; and, (3) Director Weiss and Ms. Kennedy discouraging Board members from making a decision in Mr. Kovalev's case until seven months passed, even though the Board usually made its decision on the day of the hearing or within a month.

Filing a false report could deter a person of ordinary firmness from exercising his or her First Amendment rights.[68]   Requesting the sheriffs remove Mr. Kovalev and discouraging the Board members from making a decision could also deter a person of ordinary firmness from

exercising his First Amendment rights.   Mr. Kovalev pleads sufficient facts to satisfy the second element (sufficient to deter a person of ordinary firmness) of a First Amendment retaliation claim.

### D. Director Weiss and Ms. Kennedy are entitled to qualified immunity on the First Amendment retaliation claims of requesting sheriffs' assistance and discouraging a prompt ruling on Mr. Kovalev's appeal, but not his claim for a retaliatory false report.

Even assuming Mr. Kovalev states a First Amendment retaliation claim, Defendants argue they are entitled to qualified immunity.   A government official is entitled to qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[69]   A right is not clearly established "unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."[70]   Although "officials can still be on notice that their conduct violates established law even in novel factual circumstances,"[71] the right in question must be "beyond debate" under existing precedent.[72]   We must not "define clearly established law at a high level of generality."[73]   Instead, we must consider the official's conduct within the "particular circumstances" he faced.[74]

To the extent Mr. Kovalev's First Amendment retaliation claim is based on Ms. Kennedy filing and Director Weiss approving the false report, the law is clearly established such conduct is unlawful.   Our Court of Appeals in *Thomas v. Independence Township* held the plaintiff stated a claim for First Amendment retaliation where the defendant wrongly accused the plaintiff of violating the law.[75]   At least as early as 2006, when our Court of Appeals decided *Thomas*, the law was clearly established a government official could not falsely accuse a citizen of violating the law.

To the extent Mr. Kovalev's First Amendment retaliation claim is based on Ms. Kennedy

and Director Weiss requesting the sheriffs forcibly remove Mr. Kovalev from the area, the law is not clearly established such conduct is unlawful. Our Court of Appeals in an unpublished decision, citing to the Restatement (Second) of Torts § 45A(b) published in 1965, explained an individual who "instigates" the unlawful arrest of another can be held liable for the initiation of criminal proceedings.[76] Additionally, "district courts in other jurisdictions have found that false arrest/false imprisonment claims can be brought against an individual other than the arresting officer when that person 'instigates' the arrest."[77] These authorities arguably demonstrate a clearly established a right to be free from unlawful detentions instigated by third persons. However, we cannot say these authorities clearly established a right to be free from retaliatory requests by third parties to law enforcement to unlawfully remove an individual from a building accessible to the general public. Director Weiss and Ms. Kennedy are entitled to qualified immunity to the extent Mr. Kovalev's First Amendment retaliation claim is based on Ms. Kennedy and Director Weiss requesting the sheriffs forcibly remove Mr. Kovalev from the area.

Director Weiss and Ms. Kennedy are also entitled to qualified immunity to the extent Mr. Kovalev's First Amendment retaliation claims are based on discouraging the Board members from making a decision. We are aware of no precedent clearly establishing a right to be free from retaliation in the form of discouraging individuals in judicial capacities from making decisions.

### E.  Mr. Kovalev alleges Director Weiss' personal involvement.

Defendants argue all of Mr. Kovalev's claims against Director Weiss should be dismissed because Mr. Kovalev fails to plead facts which plausibly suggest her personal involvement. "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."[78] Mr. Kovalev can

demonstrate personal involvement "through allegations of personal direction or of actual knowledge and acquiescence," so long as these allegations are made with "appropriate particularity."[79]

For example, in *Rode*, our Court of Appeals held Rode's retaliatory harassment claim against Governor Thornburgh could not proceed because Rode failed to allege knowledge or acquiescence with requisite particularity.[80]   Rode argued Governor Thornburgh had supervisory responsibility over the other defendants, but our Court of Appeals deemed this irrelevant.[81] Rode also argued Governor Thornburgh had personal knowledge of the harassment because of grievances she filed with the Governor's office of administration.[82]   Our Court of Appeals held Rode did demonstrate Governor Thornburgh had actual knowledge of the alleged harassment.[83]

Mr. Kovalev alleges Director Weiss had "direct and immediate responsibility to train and supervise employees of the City that are working in her office."[84]   As in *Rode*, the fact Director Weiss had responsibility to supervise does not demonstrate personal involvement.   Mr. Kovalev, however, also alleges Director Weiss approved Ms. Kennedy's initiation of a false report against Mr. Kovalev.   Based on this allegation, Mr. Kovalev barely but adequately pleads Director Weiss' personal involvement.

### F. We dismiss Mr. Kovalev's Fourteenth Amendment substantive due process claim against Sergeant Brown, but his other substantive due process claims may proceed.[85]

Defendants argue Mr. Kovalev has not pleaded requisite facts demonstrating conscience shocking behavior under the Fourteenth Amendment's substantive due process clause.

The Supreme Court instructs "the core of the concept" of due process is "protection against arbitrary action," and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"[86]   "[T]o prove a violation of substantive due process in

12

cases involving executive action, the plaintiff must show that the state acted in a manner that 'shocks the conscience.'"[87]   "Whether executive action is conscience shocking . . . depends on the context in which the action takes place.   In particular, the degree of culpability required to meet the 'shock the conscience' standard depends upon the particular circumstances that confront those acting on the state's behalf."[88]   "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."[89]

Filing a false report against another could shock the conscience.[90]   In *Santiago v. Steinhart*, the plaintiff alleged the defendant, an agent for the State of New York, prepared a knowingly false assessment of the plaintiff's fitness for duty, which contributed to his employer's decision to place him on involuntary leave from work.[91]   The plaintiff audio-recorded the fitness for duty assessment, which differed from the defendant's report of the assessment.[92]   The court held "a reasonable fact-finder could infer that defendant intended to falsify the report in violation of plaintiff's due process rights" and could also conclude such behavior shocks the conscience.[93]

Mr. Kovalev alleges Ms. Kennedy—motivated by an intent to retaliate—filed a false incident report against him knowing it to be false, and Director Weiss—also motivated by an intent to retaliate—approved the false report before Ms. Kennedy filed it.   A reasonable fact finder could conclude such behavior shocks the conscience.[94]   These claims against Director Weiss and Ms. Kennedy may proceed into discovery.

But we have no allegations allowing us to conclude Sergeant Brown's conduct shocks the conscience.   Mr. Kovalev does not allege Sergeant Brown knew Ms. Kennedy's report to be false.   Nor does Mr. Kovalev allege Sergeant Brown was motivated by retaliatory reasons.   Additionally, a substantive due process claim against Sergeant Brown would be duplicative of

Mr. Kovalev's claim against Sergeant Brown under the First Amendment right of access and right to information, which is based on the same conduct.   We dismiss Mr. Kovalev's substantive due process claim against Sergeant Brown.

### G. We dismiss Mr. Kovalev's Fourteenth Amendment procedural due process claims against Ms. Kennedy and Director Weiss.

Defendants argue Ms. Kovalev fails to state a claim Defendants violated his procedural due process.  Defendants' arguments are based on deprivations related to the Board hearing itself.  In his Opposition, however, Mr. Kovalev confirms his claims are based on the events which transpired after the Board hearing, not before or during the hearing.[95]

To state a claim for deprivation of procedural due process, Mr. Kovalev must allege: (1) Defendants deprived him of an individual interest encompassed within the Fourteenth Amendment's protection of life, liberty, or property; and (2) the procedures available to him did not provide due process of law.[96]   To the extent Mr. Kovalev brings a procedural due process claim, he fails to allege facts plausibly suggesting a deficiency in the procedures available to him. Mr. Kovalev does not address whether procedures were available to him, and does not contend more procedures are warranted.   We grant Defendants' motion to dismiss as to Mr. Kovalev's procedural due process claim.

### H. We dismiss Mr. Kovalev's equal protection claim based on race, national origin, and ethnicity.

Defendants argue Mr. Kovalev fails to state a claim against Sergeant Brown and Ms. Kennedy for violating his rights under the Equal Protection Clause of the Fourteenth Amendment by discriminating against him based on his race.

To establish an Equal Protection claim for selective-enforcement claim based on race, Mr. Kovalev must demonstrate (1) the defendant treated him differently from other similarly situated

14

individuals, and (2) the defendant based selective treatment on an unjustifiable standard such as race.[97]   "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'"[98]

Mr. Kovalev fails to allege facts plausibly demonstrating Sergeant Brown or Ms. Kennedy treated him differently from other similarly situated individuals.   We grant Defendants' motion to dismiss the equal protection claim against Sergeant Brown and Ms. Kennedy.

### I.   We dismiss Mr. Kovalev's negligent infliction of emotional distress claim.

Defendants argue they are entitled to immunity as to Mr. Kovalev's claims for negligent infliction of emotional distress.   In Pennsylvania, local agencies enjoy immunity in personal injury cases[99] except in eight statutorily enumerated contexts.[100]   These contexts includes (1) vehicle liability, (2) care, custody or control of personal property, (3) real property, (4) trees, traffic controls and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, and (8) care, custody or control of animals.[101]   Employees of a local agency enjoy the same level of immunity.[102]   Employees lose immunity when their conduct constitutes "a crime, actual fraud, actual malice or willful misconduct."[103]

Based on this statutory framework, the Pennsylvania Commonwealth Court held an employee of an agency is immune from a claim of negligent infliction of emotional distress.[104]   We similarly conclude the Individual Defendants enjoy immunity as to Mr. Kovalev's claim for negligent infliction of emotional distress.

### J.   Mr. Kovalev states an assault claim against Sergeant Brown.

Defendants also argue Sergeant Brown is entitled to immunity as to Mr. Kovalev's claim for assault because his claim for assault, as pled, cannot constitute willful misconduct.   Willfulness is a subjective standard requiring "a showing of an intention to do what is known to

be wrong."[105] Under our pleading rules, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[106] Willfulness is a condition of mind which Mr. Kovalev may also allege generally.[107]

Mr. Kovalev alleges Sergeant Brown intentionally staged a situation which would provoke Mr. Kovalev and intentionally intimidated and harassed Mr. Kovalev by walking into him even though he behaved peacefully and lawfully.[108] Mr. Kovalev also alleges Sergeant Brown "most likely was planning to attack [Mr. Kovalev] with force."[109]

Although Mr. Kovalev does not use the buzzword "willful," Mr. Kovalev alleges sufficient facts permitting the inference Sergeant Brown acted willfully. We will allow this claim to proceed into discovery.

### K.  Mr. Kovalev states a claim for intentional infliction of emotional distress against Director Weiss and Ms. Kennedy but not Sergeant Brown.

Defendants argue Mr. Kovalev's claim for intentional infliction of emotional distress fails because Mr. Kovalev failed to allege outrageous conduct. To state a claim for intentional infliction of emotional distress, Mr. Kovalev must plead: (1) extreme and outrageous conduct (2) intentionally or recklessly (3) causing emotional distress (4) which must be severe.[110] It is our responsibility to determine if the alleged conduct pleads the requisite level of outrageousness.[111]

For conduct to be outrageous, it "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."[112] "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'"[113]

At least one district court has held "[m]ere allegations of criminal conduct are insufficient

16

to establish that a person acted in an extreme or outrageous manner."[114]   In that case, the defendants counterclaimed against the plaintiff-relator, alleging intentional infliction of emotional distress for allegedly reporting false allegations to the United States government, resulting in a federal investigation.[115]   The defendants did not no allege the plaintiff-relator made the false statements knowing they were false.   The court concluded the plaintiff-relator did not act in an outrageous manner by merely accusing the defendants of criminal conduct.[116]

By contrast, intentionally propagating a falsehood could constitute outrageous conduct.[117] In *Banyas v. Lower Bucks Hospital*, the Pennsylvania Superior Court found outrageous the plaintiff's allegation the defendants intentionally falsified hospital records of another individual by attributing the individual's injuries to the plaintiff, resulting in murder charges against the plaintiff.[118]   Similarly, in *Chuy v. Philadelphia Eagles Football Club*, a doctor told the media the plaintiff, a former professional football player, had a fatal disease even though the doctor knew the plaintiff did not have the disease.[119]   This conduct "constituted intolerable professional conduct."[120]

Knowingly instituting false criminal charges could also constitute outrageous conduct. For example, in *Sheare v. Borough of Olyphant*, the defendant police officer charged the plaintiff with criminal trespass knowing the charge to be false and without probable cause.[121]   Likewise, in *Dempsey v. Bucknell*, the defendant police officers arrested the plaintiff on knowingly false information and accused the plaintiff of being a sexual offender knowing it to be untrue.[122]   Such statements included, among other things: (1) informing state senators the plaintiff sexually assaulted an individual; (2) informing the media the plaintiff hit the alleged victim in her breast and groin, referring to him as an attacker; and (3) filing criminal charges for simple assault, indecent assault, harassment, disorderly conduct, and false imprisonment.[123]   In both cases, the

plaintiffs' claims for intentional infliction of emotion distress survived a motion to dismiss.[124]

When considering outrageousness, the power dynamic between the plaintiff and the defendant is a relevant factor.   According to the Restatement (Second) of Torts, "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests."[125]   For example, in *Hackney v. Woodring*, the Pennsylvania Superior Court noted the defendant-employer held a position of authority over the plaintiff-employee he allegedly sexually harassed.[126]

Mr. Kovalev adequately pleads Ms. Kennedy engaged in outrageous conduct.   Ms. Kennedy intentionally fabricated a false report to law enforcement against Mr. Kovalev about him being a disorderly person, resulting in his exclusion from certain areas of public buildings normally accessible to the public.   Ms. Kennedy allegedly excluded Mr. Kovalev from the building to retaliate against Mr. Kovalev for complaining to Director Weiss.   Ms. Kennedy is not just a citizen, but also a City employee who swore to obey and defend the United States Constitution and discharge her duties with fidelity.[127]   Her public service position makes her alleged conduct particularly outrageous.   Although this case, unlike most of the cases described above, lacks defamatory statements to the media and criminal charges, a jury could still find Ms. Kennedy's conduct outrageous.

A jury could also consider Director Weiss' conduct outrageous.   Mr. Kovalev alleges Director Weiss knew about the falsity of Ms. Kennedy's report yet approved Ms. Kennedy's false report for retaliatory reasons.   Although Director Weiss did not institute criminal proceedings against Mr. Kovalev or publicize false information to the media, she approved Ms. Kennedy's report knowing it to be false and knowing it could result in criminal charges against Mr. Kovalev

18

for his innocent presence in a public building.   Director Weiss is not just a public servant, but the Executive Director of the Philadelphia Office of Administrative Review.   Her alleged retaliatory exclusion of Mr. Kovalev could be deemed outrageous by a jury.

Sergeant Brown's conduct is not outrageous.   Sergeant Brown excluded Mr. Kovalev from the building based solely on Ms. Kennedy's false report.   Mr. Kovalev does not allege Sergeant Brown knew about the falsity of Ms. Kennedy's false report.   Sergeant Brown did not arrest Mr. Kovalev or charge him with a crime.   Based on the allegations as pled, we cannot conclude Sergeant's Brown's conduct is outrageous, and we must dismiss Mr. Kovalev's claim for intentional infliction of emotional distress against Sergeant Brown.

### L.   We dismiss Mr. Kovalev's defamation claim.

Defendants argue Ms. Kennedy's assertion Mr. Kovalev was a "disorderly person" could not be understood as defamatory.   Under Pennsylvania law, statements made by individuals to the police in connection with the suspected commission of a crime are absolutely privileged, even if the statements are ultimately proven "false or maliciously motivated."[128]   Mr. Kovalev alleges Ms. Kennedy called the Sheriff's Office and accused Mr. Kovalev of being a "disorderly person," resulting in an Incident Report against Mr. Kovalev.

This statement is absolutely privileged and cannot form the basis of a defamation claim. We grant Defendants' motion to dismiss as to Mr. Kovalev's defamation claim.

### M.   We dismiss Mr. Kovalev's harassment claim.

Defendants argue Mr. Kovalev's claim for harassment fails as a matter of law because this tort is not recognized in Pennsylvania.   The Pennsylvania Superior Court has declined on several occasions to create a new cause of action for harassment.[129]   Based on the Pennsylvania Superior Court's inaction, district courts in our Circuit have refused to recognize harassment as a cause of

action in Pennsylvania.[130]

We will not create a new tort of harassment in Pennsylvania and grant Defendants' Motion to dismiss as to Mr. Kovalev's claim for harassment.

### N.  Mr. Kovalev may proceed on a supervisory liability claim.

Defendants argue Mr. Kovalev fails to state a claim for failure to train or supervise.   In *Monell*, the United States Supreme Court held a municipality may be liable under § 1983 when it causes the constitutional violation at issue.[131]   "Failure to train can be the basis of *Monell* liability when the municipality's 'failure to train reflects deliberate indifference to constitutional rights.'"[132]   "Establishing municipal liability on a failure to train claim under § 1983 is difficult. A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries."[133]   Mr. Kovalev also "must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred."[134]   Mr. Kovalev must identify "the specific training the [City] should have offered."[135]  "Mere proof that an injury could have been avoided if the municipal officer or employee 'had better or more training is not enough to show municipal liability' under a 'failure to train' *Monell* claim."[136]

Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train."[137] "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[138]   "A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and '[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the

consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'"[139]

Mr. Kovalev does not allege a pattern of constitutional violations.   Absent a pattern of violations, a failure to train claim may proceed where the constitutional violation is an "obvious" consequence of failing to provide certain training.[140]   For a municipality's failure to train or supervise to constitute deliberate indifference, a plaintiff must show: "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[141]

For example, in *Carter v. City of Philadelphia*, our Court of Appeals held the plaintiff satisfied these elements for the purpose of a motion to dismiss.[142]   The plaintiff alleged the City of Philadelphia failed to train its officers in a manner which would have prevented them from procuring perjurious eyewitness testimony and alerted assistant district attorneys of the falsity of such evidence.[143]   The plaintiff satisfied the first and third elements because police officers would be presented with opportunities to commit perjury against the innocent, and their wrong choice would frequently result in constitutional violations.[144]   As to the second element, although the situation did not involve a difficult choice and there were no allegations of a history of employees mishandling, our Court of Appeals permitted discovery on this issue, as discovery might reveal "a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury) or a pattern of police misconduct . . . ."[145]

Mr. Kovalev alleges the City of Philadelphia and Director Weiss do not offer any specialized training and do not perform any regularly administrative guidance classes related to the prevention of civil rights violations.[146]   He alleges Director Weiss "has a direct and

immediate responsibility to train and supervise employees of the City that are working in her office."[147]  Mr. Kovalev claims the City and Director Weiss' "failure to train and supervise subordinate employees, defendants' actions, policies, and practices created deliberate indifference to the constitutional rights of [Mr.] Kovalev who suffered irreparable injury to his constitutional and other legal rights."[148]

It is apparent from Mr. Kovalev's allegations the first and third elements are satisfied. Policymakers in the Office of Administrative Review would know employee would confront litigants on a daily basis.  An employee's wrong choice—such as filing a false criminal complaint—could result in the wrongful exclusion of a litigant from the office.

As to the second element, Mr. Kovalev does not allege a situation which involves a difficult choice or a history of employees mishandling.  Nonetheless, following our Court of Appeals' lead, we allow Mr. Kovalev's claim to proceed to discovery on this issue, as he may be able to prove a practice of condoning employees' wrongful exclusion of innocent litigants from the Office of Administrative Review.

We deny Defendants' Motion to dismiss Mr. Kovalev's claim for failure to train or supervise.

### III.    Conclusion

Mr. Koralev has not stated claims for Ninth Amendment violations, substantive due process violation against Sergeant Brown, procedural due process violations, Fourteenth Amendment race/ethnicity/national origin discrimination, intentional infliction of emotional distress as to Sergeant Brown, negligent infliction of emotional distress, defamation, and harassment.  We also grant Defendants' Motion as to Mr. Kovalev's First Amendment retaliation claim to the extent it is based on Ms. Kennedy and Director Weiss requesting the

sheriffs forcibly remove Mr. Kovalev from the area and discouraging the Board from making a decision.   We deny Defendants' Motion in all other respects.

---

[1] ECF Doc. No. 3, ¶ 32.

[2] *Id.* ¶ 33.

[3] *Id.* ¶ 34.

[4] *Id.* ¶ 96.

[5] *Id.* ¶ 99.

[6] *Id.* ¶ 40.

[7] *Id.* ¶ 42.

[8] *Id.* ¶ 46.

[9] *Id.*

[10] *Id.* ¶ 48.

[11] *Id.*

[12] *Id.* ¶ 51.

[13] *Id.* ¶ 52.

[14] *Id.* ¶ 53.

[15] *Id.* ¶ 56.

[16] *Id.* ¶ 54.

[17] *Id.* ¶ 57.

[18] *Id.* ¶ 58.

[19] *Id.* ¶ 59.

[20] *Id.* ¶ 60.

---

[21] *Id.* ¶ 64.

[22] *Id.* ¶ 67.

[23] *Id.*

[24] *Id.* ¶ 68.

[25] *Id.* ¶ 69.

[26] *Id.*

[27] *Id.* ¶ 70.

[28] *Id.* ¶ 71.

[29] *Id.* ¶ 72.

[30] *Id.* ¶ 73.

[31] *Id.*

[32] *Id.* ¶ 76.

[33] *Id.* ¶¶ 77, 80.

[34] *Id.* ¶ 81.

[35] *Id.* ¶ 117.

[36] *Id.* ¶ 82.

[37] *Id.* ¶ 39, 99.

[38] *Id.* ¶ 99.

[39] "We construe the pleadings of *pro se* litigants liberally." *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 604 (3d Cir. 2015). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 678). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be

more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679); *see also Burtch*, 662 F.3d at 221; *Malleus v. George*, 641 F.3d 560, 563 (3d. Cir. 2011); *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d. Cir. 2010).

[40] Out of an abundance of caution, we analyzed potential procedural due process claims even though Mr. Kovalev did not expressly assert this claim.

[41] *Clayworth v. Luzerne Cty., Pa.*, 513 F. App'x 134, 137 (3d Cir. 2013).

[42] ECF Doc. No. 3, ¶ 89–90.

[43] *Delaware Coal. for Open Gov't, Inc. v. Strine*, 733 F.3d 510, 513 (3d Cir. 2013) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980)).

[44] *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992).

[45] *Delaware Coal. for Open Gov't, Inc.*, 733 F.3d at 513.

[46] *Vincent v. City of Sulphur*, 805 F.3d 543, 548 (5th Cir. 2015).

[47] *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90–91 (1965).

[48] *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999).

[49] *Id.* at 54 (internal citation omitted).

[50] *See Vincent*, 805 F.3d at 548 ("Supreme Court decisions amply support the proposition that there is a general right to go to or remain on public property for lawful purposes . . . ."); *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) ("Plaintiffs have a constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally."); *Kennedy v. City Of Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010) ("[I]t is clear that Kennedy had a liberty interest "to remain in a public place of his choice" and that defendants interfered with this interest.").

[51] *Kreimer*, 958 F.2d at 1255.

[52] *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

[53] *Kreimer*, 958 F.2d at 1255 (quoting *Perry Educ. Ass'n*, 460 U.S. at 45).

[54] *Id.* (quoting *Perry Educ. Ass'n*, 460 U.S. at 45).

[55] *Id.* (quoting *Perry Educ. Ass'n*, 460 U.S. at 45).

[56] *Id.* at 1256.

[57] *Id.* at 1261–62.

[58] *Widmar v. Vincent*, 454 U.S. 263, 267–68 (1981).

[59] *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175–76 (1976).

[60] *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975).

[61] *Kreimer*, 958 F.2d at 1259.

[62] *Id.* at 1256 (quoting *Perry Educ. Ass'n*, 460 U.S. at 45) (brackets omitted).

[63] *Perry Educ. Ass'n*, 460 U.S. at 46 (citing *U. S. Postal Serv. v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 131 n.7 (1981)).

[64] *Id.* (quoting *U. S. Postal Serv.*, 453 U.S. at 129).

[65] *Kreimer*, 958 F.2d at 1259–60.

[66] ECF Doc. No. 3, ¶ 96.

[67] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)).

[68] *See R.K. v. Y.A.L.E. Sch., Inc.*, 621 F. Supp. 2d 188, 197 (D.N.J. 2008) (retaliatory conduct consisted of "filing a fraudulent truancy complaint against Plaintiffs with the Medford Township Police Department").

[69] *Berg v. Cty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[70] *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[71] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[72] *Plumhoff*, 134 S. Ct. at 2023 (citing *Ashcroft*, 563 U.S. at 741).

[73] *Id.*

[74] *Id.*

[75] *Thomas*, 463 F.3d at 290, 296.

[76] *DiStefano v. Macy's Retail Holdings, Inc.*, 616 F. App'x 478, 481 n.2 (3d Cir. 2015).

[77] *O'Hara v. Hanley*, No. 08-1393, 2009 WL 2043490, at *5 (W.D. Pa. July 8, 2009) (collecting cases).

[78] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981)).

[79] *Id.*

[80] *Id.* at 1208.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] ECF Doc. No. 3, ¶ 28.

[85] In his Opposition, Mr. Kovalev clarified he is not pursuing claims under the Fourth Amendment. ECF Doc. No. 8, p. 8, 16.

[86] *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 129 (1992)).

[87] *Schieber v. City of Philadelphia*, 320 F.3d 409, 417 (3d Cir. 2003) (quoting *Cty. of Sacramento*, 523 U.S. at 846).

[88] *Id.* at 417.

[89] *Cty. of Sacramento*, 523 U.S. at 849.

[90] *Santiago v. Steinhart*, No. 89-2069, 1993 WL 410402, at *2 (S.D.N.Y. Oct. 13, 1993).

[91] *Id.* at *1.

[92] *Id.*

[93] *Id.* at *2.

[94] *See id.*

[95] ECF Doc. No. 8, p. 8.

[96] *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

[97] *Dique v. New Jersey State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010).

[98] *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

[99] 42 Pa. C.S.A. § 8541.

[100] 42 Pa. C.S.A. § 8542(b).

[101] *Id.*

[102] 42 Pa. C.S.A. § 8545.

[103] 42 Pa. C.S.A. § 8550.

[104] *Lancie v. Giles*, 572 A.2d 827, 830 (Pa. Cmwlth. 1990).

[105] *In re City of Philadelphia Litig.*, 158 F.3d 723, 728 (3d Cir. 1998) (citing *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 600–01 (3d Cir. 1998)).

[106] Fed. R. Civ. P. 9(b).

[107] *Curtis v. Unionville-Chadds Ford Sch. Dist.*, No. 12-4786, 2013 WL 1874919, at *7 (E.D. Pa. May 1, 2013).

[108] ECF Doc. No. 3, ¶ 113–14, 116.

[109] *Id.* ¶ 114.

[110] *White v. Ottinger*, 442 F. Supp. 2d 236, 251 (E.D. Pa. 2006) (citing *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. 1997)).

[111] *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1487 (3d Cir. 1990) (citing *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988)).

[112] *Hoy*, 720 A.2d at 754 (quoting *Buczek v. First National Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. 1987)).

[113] *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997).

[114] *U.S. ex rel. Magid v. Wilderman*, No. 96-4346, 2005 WL 469590, at *5 (E.D. Pa. Feb. 28, 2005).

[115] *Id.*

[116] *Id.*

[117] *See Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236, 1239 (Pa. Super. 1981).

[118] *Id.*

[119] *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274 (3d Cir. 1979).

[120] *Id.*

[121] *Sheare v. Borough of Olyphant*, No. 11-1639, 2012 WL 2527022, at *9 (M.D. Pa. June 29, 2012).

[122] *Dempsey v. Bucknell Univ.*, No. 11-1679, 2012 WL 1569826, at *24 (M.D. Pa. May 3, 2012).

[123] *Id.* at *13.

[124] *Id.* at *24; *Sheare*, 2012 WL 2527022, at *9.

[125] Restatement (Second) of Torts § 46, Comment e (1965); *see also Hackney v. Woodring*, 622 A.2d 286, 288 (Pa. Super. 1993), *rev'd on other grounds*, 652 A.2d 291 (Pa. 1994).

[126] *Hackney*, 622 A.2d at 288, *rev'd on other grounds*, 652 A.2d 291 (Pa. 1994).

[127] Philadelphia Code § 20-102(1).

[128] *Pawlowski v. Smorto*, 588 A.2d 36, 42 (Pa. Super. 1991).

[129] *Sobel v. Wingard*, 531 A.2d 520, 523 (Pa. Super. 1987) (citing *DeAngelo v. Fortney*, 515 A.2d 594 (Pa. Super. 1986)).

[130] *See, e.g.*, *Keahey v. Bethel Twp., Pa.*, No. 11-7210, 2012 WL 478936, at *12 (E.D. Pa. Feb. 15, 2012) ("Harassment is not, however, recognized as an independent cause of action in Pennsylvania."); *Abdullah v. Fetrow*, No. 05-1135, 2006 WL 1274994, at *8 (M.D. Pa. May 8, 2006) ("[T]here does not exist a cause of action for 'harassment' under Pennsylvania law.").

[131] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); see also City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989).

[132] *Wood v. Williams*, 568 F. App'x 100, 105 (3d Cir. 2014) (quoting *City of Canton*, 489 U.S. at 388, 392).

[133] *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (citing *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1030 (3d Cir. 1991)).

[134] *Id.* (citing *Colburn*, 946 F.2d at 1030).

[135] *Id.*

[136] *White v. Brommer*, 747 F. Supp. 2d 447, 463 n.42 (E.D. Pa. 2010) (quoting *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 629 (3d Cir. 2007)); *see also City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

[137] *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

[138] *Id.* (quoting *Connick*, 563 U.S. at 62).

[139] *Thomas*, 749 F.3d at 223 (quoting *Bryan Cnty.*, 520 U.S. at 407).

[140] *Connick*, 563 U.S. at 63.

[141] *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (footnote omitted).

[142] *Id.* at 357.

[143] *Id.* at 343.

[144] *Id.* at 357.

[145] *Id.*

[146] ECF Doc. No. 3, ¶ 16–17.

[147] *Id.* ¶ 28.

[148] *Id.* ¶ 85.